**Judith HARRIS, Plaintiff–Appellant, Cross–Appellee,**

v.

**MUTUAL OF OMAHA COMPANIES and Rural Carrier Benefit Plan, Defendants–Appellees, Cross–Appellants.**

Nos. 92–3301, 92–3384.

United States Court of Appeals, Seventh Circuit.

Argued March 30, 1993.

Decided April 29, 1993.

---

W. Scott Montross (argued), Townsend, Hovde & Montross, Indianapolis, IN, David W. Stone, IV, Stone Law Office & Legal Research, Anderson, IN, for plaintiff-appellant, cross-appellee.

Ariane Schallwig Johnson, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, Thomas E. Johnson (argued), Steven D. Davidson, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, NE, for defendants-appellees, cross-appellants.

Before CUMMINGS and RIPPLE, Circuit Judges, and TIMBERS, Senior Circuit Judge.*

RIPPLE, Circuit Judge.

This is an appeal from a district court denial of preliminary injunction and declaratory judgment to a federal employee claiming health insurance coverage for a particular type of cancer treatment. The Office of Personnel Management (OPM), the agency charged with administering the Federal Employees Health Benefits Act (FEHBA), had determined that the employee's specific health insurance contract did not cover the treatment. For the reasons that follow, we affirm the judgment of the district court.

I

BACKGROUND

Judith Harris has been diagnosed as having advanced stage breast cancer. Her treating physician recommended that she undergo High Dosage Chemotherapy with Autologous Bone Marrow Transplants (HDC–ABMT) and referred her to Dr. Broun, an oncologist at Indiana University Medical Center. HDC–ABMT involves the use of extremely high doses of chemotherapy. During conventional chemotherapy, such high doses would result in the loss of bone marrow which produces necessary red blood cells and, consequently, would be lethal. The risk of toxicity is reduced in HDC–ABMT by removing a portion of the patient's own ("au-

* The Honorable William H. Timbers, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, is sitting by designation.

tologous") bone marrow and by reinjecting those cells after the completion of chemotherapy. According to Dr. Broun, without HDC–ABMT Ms. Harris has very little chance of surviving for five years; with the procedure, she has a greater than sixty-five percent chance of survival beyond five years. The HDC–ABMT treatment costs between $100,000 and $150,000 per patient, and Indiana University requires pre-secured financing or pre-certification from a prospective patient's insurance company that the treatment costs will be reimbursed.

Ms. Harris is a federal postal worker insured by the Rural Carrier Benefit Plan ("RCBP" or "the Plan"), a health insurance policy that is underwritten by the defendant, Mutual of Omaha (Mutual). As a federal employee, Ms. Harris has the opportunity once a year to switch health care policies during an "open season." During open season, employees receive a comparison chart that summarizes the general differences in coverage offered by the various policies. Ms. Harris switched policies most recently at the beginning of 1992, after she had been diagnosed with breast cancer. She selected the Rural Carrier Benefit Plan because it covered the costs of cancer treatment.

### A. The Plan

The RCBP is detailed in a twenty-four page brochure which notes on the front page: "This brochure is the official statement of benefits available to FEHB members and is the sole document you should rely upon." On page 9 of the policy, under the heading "General Exclusions," the policy states:

> Benefits are not provided for services and supplies ... [t]hat are investigational or experimental or are mainly for research purposes.

Plaintiff's Ex. 1 at 9. On page 5 of the policy under the heading "Definitions" the policy states:

> A drug, device or medical treatment or procedure is experimental or investigational:
>
> . . . .
>
> (2) if Reliable Evidence shows that the drug, device or medical treatment or procedure is the subject of on-going phase I,

II, or III clinical trials or under study to determine its maximum tolerated dose, its toxicity, its safety, its efficacy, or its efficacy as compared with the standard means of treatment or diagnosis; or

> (3) if Reliable Evidence shows that the consensus of opinion among experts regarding the drug, device or medical treatment or procedure is that further studies or clinical trials are necessary to determine its maximum tolerated dose, its toxicity, its safety, its efficacy or its efficacy as compared with the standard means of treatment or diagnosis.

Id. at 5. The term "reliable evidence" is used in the definition as a term of art and is defined thus:

> Reliable evidence shall mean only published reports and articles in the authoritative medical and scientific literature; the written protocol or protocols used by the treating facility or the protocol(s) of another facility studying substantially the same drug, device or medical treatment or procedure; or the written informed consent used by the treating facility or by another facility studying substantially the same drug, device or medical treatment or procedure.

Id. (emphasis added). On page 15 of the policy under the heading "Additional Benefits" the policy states:

> The Plan will pay, without dollar limitation, 100% of the reasonable and customary charges for any services and supplies normally covered by the Plan for the treatment of any illness diagnosed as cancer.

Id. at 15. Mutual does not dispute that 100 percent of the costs of "normal" cancer treatments are covered under the policy. In fact, Ms. Harris has received standard low dosage chemotherapy in the past year which the Mutual policy covered in full. Rather, Mutual argues that the specific form of cancer treatment Ms. Harris seeks is not covered under the Plan.

### B. Agency Record

The record indicates that OPM considered the following items in reviewing Mutual's decision to deny coverage: (1) the written treatment protocol; (2) a letter submitted by

Dr. Broun; (3) the Informed Consent Statement that Ms. Harris would have to sign before receiving the treatment; (4) eighteen published articles and reports submitted by Mutual; and (5) a paper written by a team of oncology experts and submitted to OPM by Ms. Harris. *See* Lease Declaration, Vol. 1 Loose Pleadings.

### 1. Written Protocol

Because HDC–ABMT involves clinical trials using human subjects, it must be performed pursuant to a detailed written set of procedures known as a protocol. *See* National Cancer Institute Investigator's Handbook, Ex. D. The protocol sets forth the proposed treatment regimen and is presented to an Institutional Review Board for approval. The protocol for the treatment for which Ms. Harris is seeking insurance coverage is titled: "Phase II Trial of Standard Induction Therapy Followed by High–Dose Carboplatin/Cyclophosphamide with Standard Dose Etopside and Autologous Bone Marrow Rescue for Advanced Breast Cancer." The listed objectives of the Protocol are three-fold:

1. Establish response rate and duration of response in advanced breast cancer treated with [the Broun Treatment].

2. Determine toxicity associated with such a regimen in patients with high risk primary and advanced breast cancer.

3. Determine length of survival of these patients treated with such a regimen.

Ex. A § 1.0. The purpose of the Protocol "is to investigate the possibility of improving the duration of response and survival of patients with previously untreated breast cancer ... by administering [the Broun Treatment]." *Id.* § 2.0, at 3–4. Section 11.0 of the Protocol further states:

> This is a phase I/II study designed to test the effectiveness of standard induction therapy followed by 2 rounds of high dose therapy with autologous bone marrow rescue in the treatment of advanced breast cancer. The primary endpoints of the study are response rate, response duration and survival. We would anticipate enroll-

ing 18–20 patients over an 18–24 month period.

*Id.* § 11.0.

### 2. Dr. Broun's testimony regarding the Protocol

The Protocol was originally implemented by Dr. Broun and his colleagues in October 1990. It has been amended twice, but the provisions quoted above have remained unchanged. Indiana University has a Data Monitoring Committee that reviews and determines whether a protocol is effective or ineffective. To date, that committee has not certified whether the Protocol is effective. Mem.Op. at 13. Dr. Broun testified that, although the Protocol's plain language provides that the procedure is a Phase I/II trial, the Protocol is in fact outdated. He testified that the Protocol, which has now been used with forty-two patients, moved beyond Phase II after the first twenty patients had received treatment. Tr. of Aug. 21, 1992 at 67–72. Dr. Broun opined that, although the treatment was experimental three or four years ago, it is currently the standard treatment for advanced stage breast cancer.

### 3. Informed Consent Statement

Prior to receiving any HDC–ABMT treatments, Ms. Harris would have to sign an Informed Consent Statement. *See* Ex. B. The Informed Consent Statement she would receive tracks the Protocol closely and identifies the procedure as a "Phase II Trial." Defendant's Ex. 5. A copy of the consent statement Ms. Harris would need to sign is part of the administrative record and was before the agency prior to its final decision.

### 4. Authoritative medical and scientific literature

As part of the OPM record, Mutual introduced eighteen published articles and reports from sources that Dr. Broun asserted are authoritative in his field. The articles were published between November 1986 and July 1992. Each of the articles reached the conclusion that HDC–ABMT is currently in the developmental stage and requires more clinical research before it can be considered standard treatment for breast cancer. Additionally, each article indicated that HDC–ABMT

treatment was either a Phase II or Phase III procedure.

### 5. "Dream Team" paper

Ms. Harris submitted into the agency record a confidential draft document prepared by a group of doctors that Dr. Broun called "the dream team" of oncology. The "Dream Team" paper, which was last revised in July 1990, concludes that "[t]he use of high-dose chemotherapy and autologous bone marrow support for selected patients with breast cancer should no longer be considered investigational." Ex. 4 at 2. Although the Dream Team paper has not been published in any authoritative journal, Dr. Broun stated that the paper has been widely circulated among the medical community and is relied upon in his field.

## II

### EARLIER PROCEEDINGS

On January 15, 1992, after determining that Ms. Harris was a good candidate for HDC–ABMT, Dr. Broun wrote to Mutual to receive assurance that Ms. Harris' insurance policy would cover the costs of the treatment. Mutual replied on March 18 that, because the treatment was experimental or investigational, the company could not pre-certify coverage. Dr. Broun wrote a second letter to Mutual on March 31 requesting that Mutual reconsider its decision to deny coverage. On May 11, Mutual replied that it had again reviewed the request and was standing by its original decision to deny coverage.

On June 3, David Denslaw, Ms. Harris' attorney, wrote to Mutual requesting that it send him "information and materials that delineate the reasons for the claim of noncoverage." Although this communication was sent directly to the offices of Mutual, the letter itself contained a formal business addressee caption that listed both OPM and Mutual. Apparently, Mutual forwarded attorney Denslaw's letter to OPM. On June 15, OPM sent notice to Mr. Denslaw that Mutual must be allowed to reconsider its decision prior to OPM review. On June 16, Mutual wrote to Mr. Denslaw restating its position that HDC–ABMT was "experimental/investigational" and not covered by the RCBP policy.

On July 10, Mr. Denslaw again wrote to OPM to request reconsideration of Mutual's denial of coverage. The letter contained a copy of Mutual's June 16 denial upon reconsideration and expressed Ms. Harris' intent to appeal that decision "at all appropriate levels." On July 21, OPM contacted Mutual and requested the information that Mutual had reviewed prior to denying coverage. Mutual first responded on July 31 by sending a letter to Ms. Harris' newly retained second attorney, W. Scott Montross. This letter explained that the June 16 denial was based upon the specific language in the Plan that defined phase I, II, or III clinical trials as experimental or investigational, and also explicitly defined what constituted "reliable evidence" to determine whether a procedure was experimental or investigational. According to the letter, all of the information submitted to and reviewed by Mutual indicated that the HDC–ABMT procedure for which Ms. Harris sought coverage was a Phase II clinical trial. The letter concluded by inviting Ms. Harris to submit any additional information that would alter the decision or, alternatively, to appeal the decision to OPM. On August 6, Mutual responded directly to OPM's request for further information by sending a list of the items that it had relied upon in determining that the treatment for which Ms. Harris requested coverage was experimental or investigational. Subsequently, on August 13, a more detailed seven-page summary of Mutual's review was sent to OPM. This letter provided a thorough discussion of the bases for Mutual's decision to deny coverage. Mutual attached several exhibits to the letter, including the Protocol, an Informed Consent Statement, and the eighteen published reports and articles that are part of the administrative record in this matter.

On August 10, while the matter was still pending before OPM, attorney Montross, on Ms. Harris' behalf, initiated the present action in federal district court. On August 13, Mr. Montross again wrote to OPM. Mr. Montross' letter included a copy of the Complaint and Memorandum in Support of Motion for Preliminary Injunction that had been

filed in federal court on August 10 and a copy of the "Dream Team" paper. Pursuant to a request from OPM, the district court granted a limited stay in the matter to allow OPM to complete the already pending review process and issue a final decision.

On August 18, Kenneth Lease, Chief of OPM's Health Benefits Contracts Division I, wrote to Mr. Denslaw to explain why Mutual had denied pre-certification. The OPM denial consisted of a five-paragraph letter that stated in pertinent part:

> The Plan has concluded that the proposed procedure is "investigational or experimental" when applied to breast cancer and is therefore excluded by the Rural Carrier Benefit Plan (RCBP). As explained on page 9 of the RCBP brochure, benefits are not provided for services and supplies that are investigational, experimental or are mainly for research purposes.
>
> We have reviewed the issue of HDCT/ABMT on numerous occasions. It remains our conclusion that its efficaciousness in the treatment of breast cancer has not been established, and that it is still in the experimental/investigative stage. Since the Rural Carrier Benefit Plan excludes benefits for services which are considered experimental/investigative, we have no basis to compel the Plan to provide benefits.

Plaintiff's Ex. 5 at 1. On the following day, August 19, Mr. Lease executed a formal sworn declaration that OPM had considered the following items in reaching its decision to affirm Mutual's denial of coverage:

1. Disputed Claim Review Decision issued by OPM on August 18, 1992;
2. 1992 RCBP Brochure;
3. The Protocol;
4. The Informed Consent Statement;
5. Published authoritative medical literature submitted by Mutual (the eighteen

reviews and articles received as evidence in this matter);

6. Correspondence and medical records relating to Judith Harris, submitted by Mutual;
7. Letter and attached documents dated June 3, 1992, received from David Denslaw;
8. Letter and attached documents dated July 10, 1992, received from David Denslaw; and
9. Letter and attached documents dated August 13, 1992, received from W. Scott Montross.

Lease Declaration, Vol. 1 Loose Pleadings.

On August 21, the district court held a hearing. The court concluded that OPM was the federal administrative agency charged with overseeing the FEHBA health care policies and that its decisions were governed by the Administrative Procedure Act (APA). That is, OPM decisions to deny coverage must be upheld unless they are determined to be arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A) (1988). Further, the court noted that its deferential review was strictly limited to the record before OPM when the agency decision was made. Finally, the district court concluded that the policy was not ambiguous and that OPM's decision was not only rational, but it was compelled by the evidence submitted to the agency.

## III

### DISCUSSION

The facts surrounding this case are not in dispute. The only issue before us is the legal question of whether the insurance contract between Ms. Harris and Mutual requires Mutual to provide coverage for the HDC–ABMT procedure which Dr. Broun has recommended for Ms. Harris.[1]

---

**1.** On cross-appeal, Mutual alleges that, although the district court reached the correct conclusion, it was error to apply Indiana law, rather than a federal common law of contracts, to determine whether the contract is ambiguous. We dismiss the cross-appeal. Generally, a party must establish an independent jurisdictional ground to bring a cross-appeal. *Pearl v. Keystone Consol. Indust., Inc.,* 884 F.2d 1047, 1052–53 (7th Cir. 1989) ("unless a party requests the alteration of a judgment in its favor, it should not file a …

cross appeal"); 15A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3904, at 205–07 (2d ed. 1992). In the instant case, Mutual does not question the result, but only the reasoning. This is not sufficient to support a cross-appeal. *See Chouinard v. Chouinard,* 568 F.2d 430, 433 (5th Cir.1978) (cannot cross-appeal solely to argue the district court erred regarding "reasons for the judgment"). Nevertheless, the issue is before us in Ms. Harris' appeal. We see no

## A. *Standard of Review*

■ Ms. Harris argues that the district court erred in applying the "arbitrary and capricious" standard of review.[2] We cannot agree. The RCBP is administered through OPM. Under OPM regulations an insured may appeal to OPM for review of the insurance company's unfavorable decision regarding coverage. *See* 5 C.F.R. § 890.105 (1992). Congress has provided that the APA applies to all actions of federal agencies unless explicitly prohibited by statute. 5 U.S.C. § 701(b)(2) (1988). Ms. Harris has not contended that OPM's administrative review process is contrary to the authority provided by its governing statute. *See* 5 U.S.C. §§ 8901–13 (general FEHBA scheme; OPM has authority to make determinations upon issues such as who is eligible to participate and whether a plan is adequate); *id.* § 8913 (OPM has the authority to make regulations to carry out the scheme laid out in §§ 8901–13). The August 18 letter in which OPM affirmed Mutual's denial of coverage was a final decision within the meaning of the APA. Under the APA, a reviewing court may set aside a final agency determination only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *Camp v. Pitts*, 411 U.S. 138, 140–43, 93 S.Ct. 1241, 1243–44, 36 L.Ed.2d 106 (1973) (per curiam); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). Accordingly, the district court did not err in applying the deferential standard of review required by the APA.

reason to disagree with our colleagues in the Eleventh Circuit that federal law applies. *See Tackitt v. Prudential Ins. Co. of Am.*, 758 F.2d 1572, 1575 (11th Cir.1985) (citing 5 U.S.C. § 8902(m)(1) (1988) for the proposition that federal law governs the interpretation of government health insurance contracts).

**2.** Ms. Harris argued to the district court and has again submitted on appeal that, because it was not necessary to exhaust administrative review through OPM, the agency proceedings should not be considered in federal court. The district court correctly concluded that because Ms. Harris did in fact exhaust administrative review, whether such exhaustion was required is a moot issue. Additionally, Ms. Harris has suggested that she never "requested" OPM review. The

## B. *Agency Proceedings*

■ Ms. Harris argues that OPM merely "rubber stamped" Mutual's denial of coverage and that, because OPM did not make adequate independent factual determinations, its findings should be accorded no deference.[3] The district court noted that OPM made no explicit factual findings in its formal letter of decision. Mem.Op. at 31. However, the court concluded that the letter affirming the company's denial of benefits, together with Mr. Lease's sworn declaration listing the documents that were before the agency for review, was sufficient record evidence to support the agency's determination. We agree. Ms. Harris is correct that the final decision issued by OPM is less than an exacting account of its review process and conclusions. Nonetheless, it is adequate. "While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Trans., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)); *see also Camp*, 411 U.S. at 142–43, 93 S.Ct. at 1243–44 (although "curt," agency decision that indicated determinative reason for outcome was not arbitrary or capricious).

On the administrative record, we have no trouble tracing OPM's decisional path. Only three forms of proof qualify as "reliable evidence" under the Plan. In this instance, all

record does not support this assertion. Both of Ms. Harris' attorneys corresponded repeatedly with OPM and appear to have participated fully in the review process.

**3.** Additionally, Ms. Harris has suggested that OPM has a conflict of interest because it has an interest in keeping federal health care costs low. Thus, submits Ms. Harris, OPM has an inevitable bias in favor of Mutual. This suggestion is without merit. OPM has an interest in administering the will of Congress and providing the best possible, albeit cost effective, health coverage for employees. There is no legally significant conflict in Congress charging OPM with the responsibility of balancing these unavoidably conflicting interests.

three forms of reliable evidence support the view that HDC–ABMT is experimental under the Plan's definition and is not covered. Specifically, the written Protocol expressly and repeatedly states that the treatment is currently at the phase II clinical trial stage; Ms. Harris would have to sign an Informed Consent Statement that clearly identifies the treatment as a phase II clinical trial; and all eighteen of the published articles and reports submitted to OPM indicated that the treatment is generally classified as a phase II or phase III clinical trial and that it is considered to be in an experimental stage.

Ms. Harris asserts that OPM's denial was arbitrary and capricious in light of expert testimony and other judicial decisions that have concluded that HDC–ABMT is not experimental. Significantly, the majority of the cases that Ms. Harris relies upon involve interpreting policies that exempted "experimental" treatments but did not define the term "experimental." Here, the district court correctly found that cases interpreting materially different policy language do not govern the *contractual* relationship Ms. Harris has with Mutual.[4] The Rural Carrier Benefit Plan contract is clear. None of the evidence Ms. Harris submitted falls within the policy definition of "reliable evidence." Mutual's decision denying coverage and OPM's review and affirmance of that decision are rational. Accordingly, we cannot conclude that denial of coverage was arbitrary and capricious. Moreover, because of the plain language of the contract, we would have no choice but to affirm the denial of coverage even if, *arguendo*, we were to review that decision de novo.

Ms. Harris also argues that the district court erred in limiting the admissible evidence to evidence contained in the administrative agency record. It did not. The Supreme Court has repeatedly made clear that, when reviewing the decision of an administrative agency, a court may only consider the evidence that was before the agency. *Camp,* 411 U.S. at 142, 93 S.Ct. at 1243; *Overton Park,* 401 U.S. at 421, 91 S.Ct. at 826. Moreover, even if we were not constrained by the administrative record, Ms. Harris could not prevail. The district court "conditionally" admitted *all* evidence that might be relevant. Only after Ms. Harris had made all of her evidentiary offerings did the court determine that its decision must be based solely upon evidence that was before the agency. Specifically, Ms. Harris made two evidentiary proffers that were outside the agency record. First, testimony of the OPM review officer that he never spoke directly with Ms. Harris was excluded. This is of little significance given the fact that the review officer had corresponded repeatedly with both of Ms. Harris' attorneys. Moreover, the agency is not required to hear oral testimony as long as a written record is compiled and reviewed. Second, testimony from Ms. Harris' oncologist, Dr. Broun, that the treatment was beyond phase II but that he had not yet updated the Protocol, was excluded. This also adds little to the agency record. Under the policy, only "reliable evidence" may be considered in determining whether a treatment is experimental, and the policy explicitly defines "reliable evidence." Although the *written* Protocol is "reliable

---

4. We are aware that there is a growing and confusing body of case law that addresses whether HDC–ABMT is an experimental procedure for purposes of insurance coverage. The courts that have struggled with the issue have reached different outcomes. *Compare Dahl–Eimers v. Mutual of Omaha,* 986 F.2d 1379 (11th Cir.1993) (phrase " 'considered experimental,' standing alone in a major medical insurance policy, is ambiguous under Florida law as a matter of law") and *Nesseim v. Mail Handlers,* 792 F.Supp. 674, 677 (D.S.D.1992) (no special deference accorded to agency decision that merely "rubber stamped" insurance company's denial of coverage without making an independent agency review; ambiguous policy interpreted to cover HDC–ABMT) *with Arrington v. Group Hosp.,* 806 F.Supp. 287, 290–91 (D.D.C.1992) (OPM affirmance of insurance company's denial of coverage was "rational decision" and not arbitrary or capricious). These cases are instructive to place in perspective that at the heart of this dispute is a need for both insurance contract drafters and insurance consumers to use greater care in their dealings. However, ultimately the cases offer little help to our legal analysis. At bottom, this case is one of contract interpretation. Accordingly, it is controlled by the specific language of the contract into which Ms. Harris and Mutual entered. Because the language of that contract is plain, there is no need, and indeed no authority, to explore the language of other insurance contracts.

evidence," the oral testimony that the Protocol is outdated is not.

Finally, Ms. Harris argues that OPM specifically sought information only from Mutual and ignored evidence that her attorney did submit for consideration. The record does not support this assertion. The administrative record includes the "Dream Team" paper that Ms. Harris' attorney submitted to the agency as well as two letters written by Dr. Broun. We cannot accept that OPM denied Ms. Harris an adequate opportunity to present her arguments.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.