has had an opportunity to consider the motion.

## CATHOLIC DIOCESE OF BILOXI SUPPLEMENTAL MEDICAL REIMBURSEMENT PLAN AND CATHOLIC DIOCESE OF BILOXI, Office of Risk Management, Plaintiffs

v.

## BLUE CROSS, BLUE SHIELD OF TEXAS and Office of Personnel Management, Defendants.

Civil Action No. 1:95–CV–554Br(R).

United States District Court,
S.D. Mississippi.

March 26, 1997.

Cynthia L. Tolbert, Cynthia L. Tolbert, Attorney, Metairie, LA, for Catholic Diocese.

Stephen J. Carmody, Christopher A. Shapley, Brunini, Grantham, Grower & Hewes, Jackson, for Blue Cross, Blue Shield.

Stephen R. Graben, U.S. Attorney's Office, Southern District of Mississippi, Biloxi, for Office of Personnel Management.

*MEMORANDUM OPINION
AND ORDER*

BRAMLETTE, District Judge.

This cause is before the Court on the defendant Blue Cross, Blue Shield of Texas ("Blue Cross")'s motion to dismiss (**docket entry no. 18**), the plaintiffs Catholic Diocese of Biloxi Supplemental Medical Reimbursement Plan and Catholic Diocese of Biloxi, Office of Risk Management ("the Diocese")'s motion for summary judgment (**docket entry no. 20**), and the defendant Office of Personnel Management ("OPM")'s motion for summary judgment (**docket entry no. 24**). Blue Cross has also joined in defendant OPM's motion. Having carefully considered the motions, responses, memoranda and all supporting documents, the Court finds as follows:

This action is a dispute between two insurers' health benefit plans over coverage for medical expenses incurred by Patricia Cardillo. Her claim for medical benefits has been assigned to the plaintiffs. Mrs. Cardillo is an employee of the Catholic Diocese of Biloxi, and her husband is a retired federal employee. Mrs. Cardillo is a beneficiary in the Diocesan employee welfare benefit plan ("the Diocesan Plan"), and is also a dependent under her husband's federal employee health benefit plan through Blue Cross ("the FEHBA Plan").

In November of 1992, Mrs. Cardillo incurred medical expenses for cancer treatments at M.D. Anderson Cancer Center in Houston, Texas, and filed claims for benefits with Blue Cross. Blue Cross denied primary coverage under the terms of its policy because Mrs. Cardillo was insured as an employee of the Diocese. Mrs. Cardillo appealed to OPM, and OPM upheld the initial decision of Blue Cross.

On November 1, 1995, the plaintiffs (Mrs. Cardillo's employer's medical benefits plan and its administrator) filed their complaint against Blue Cross seeking relief under the Employee Retirement Income Security Act ("ERISA"), 28 U.S.C. § 1001 *et seq.* On December 29, 1995, the plaintiffs filed their first amended complaint, adding OPM as a defendant and seeking additional relief under the Federal Employees Health Benefit Act and ERISA.

The dispute in this case involves the coordination of benefits between the Cardillos' two health plans. Both plans claim secondary posture for payment of the claims at issue. The parties are in agreement that there are no factual disputes, only legal issues, and that this case is ready for final disposition on the merits.

The Federal Employees Health Benefits Program was created by the Federal Employees Health Benefits Act ("FEHBA"), 5 U.S.C. § 8901 *et seq.,* to provide Federal employees a "measure of protection . . . against the high, unbudgetable, and . . . financially burdensome costs of medical service through a comprehensive Governmentwide program of insurance." H.R.Rep. No. 957, 86th Cong., 1st Sess. 1 (1959) *reprinted in* 1959 U.S.C.C.A.N. 2913, 2914, and "to assure that federal employee health benefits are equivalent to those available in the private sector so that the federal government can compete in the recruitment and retention of competent personnel." *American Federation of Government Employees v. Devine,* 525 F.Supp. 250, 252 (D.D.C.1981). FEHBA is a comprehensive statute regulating federal employee health benefit plans. FEHBA es-

tablishes qualifications for carriers and requires certain benefit types, levels and rates. *See* 5 U.S.C. §§ 8902, 8903. In FEHBA Congress expressly delegated authority to OPM to negotiate health benefit contracts with carriers, to promulgate regulations and, in general, to administer the program *Id.* §§ 8902, 8913. The government pays the majority of plan premiums. *Id.* §§ 8906, 8909. Further, FEHBA contracts are government procurement contracts negotiated between qualified carriers and OPM. The federal employee does not enter into a separate contract with the carrier, but rather is a third-party beneficiary of the OPM-carrier contract. *See Caudill v. Blue Cross and Blue Shield of North Carolina,* 999 F.2d 74, 76 (4th Cir.1993).

Congress has also authorized OPM to prescribe minimum standards of conduct for FEHBA carriers and to withdraw plan approval should carriers fail to discharge their duties. See 5 U.S.C. §§ 8902(e), 8902a. The benefits, rates, requirements, and exclusion of the 1992 plan involved here are either mandated by FEHBA or considered by OPM to be "necessary or desirable" for the program. 5 U.S.C. § 8902(d); *National Federation of Fed. Employees v. Devine,* 679 F.2d 907 (D.C.Cir.1981). OPM makes "available to each individual eligible to enroll in a health benefits plan under [FEHBA] such information . . . as may be necessary to enable the individual to exercise an informed choice among the [plans competing in FEHBA Plan's "open season" that year]". 5 U.S.C. § 8907 and 5 C.F.R. § 890.301(d). FEHBA also requires that enrollees are provided a Statement of Benefits setting forth the plan's "benefits, including maximums, limitation, and exclusions" for the ensuing plan year, the "procedure for obtaining benefits," and the "principal provisions of the plan affecting the enrollee and any eligible family members." 5 U.S.C. § 8907(b). The Statement of Benefits is incorporated by reference into the contract between OPM and the plan's carrier and is the official and exclusive description of the plan benefits.[1] This competi-

---

**1.** Page 2 of the 1992 Blue Cross and Blue Shield Statement of Benefits contains the following notice:

**The Blue Cross and Blue Shield Service Benefit Plan**
The Blue Cross and Blue Shield Association, on behalf of Blue Cross and Blue Shield Plans,

tive system allows an employee "to exercise independent judgment and obtain the plan which best suits his or her individual needs or family circumstances." H.R.Rep. No. 957, 86th Cong., 1st Sess. 4, *reprinted in* 1959 U.S.C.C.A.N. 2913, 2916.

OPM contracts for the Service Benefit Plan with the Blue Cross and Blue Shield Association which acts on behalf of Blue Cross Blue Shield of Texas and other participating Blue Cross and Blue Shield organizations in other geographic areas. Because this contract is a Federal Procurement contract of the United States, it is subject to extensive Federal Procurement regulations. *See* 48 C.F.R. §§ 1601.101, 1602.103; 46 Fed. Reg. 6,022 (1981). Federal employees do not contract for health benefits with Blue Cross and Blue Shield Association or Blue Cross Blue Shield of Texas. Rather, they enroll in the Service Benefit Plan pursuant to OPM regulations. 5 C.F.R. §§ 890.101(a), 102–104, and sub-parts C, D, and K.

In 1974, Congress mandated that every FEHBA contract contain an obligation that the FEHBA carrier "agree to pay for or provide a health service or supply in an individual case if [OPM] finds that the employee, annuitant, family member ... is entitled thereto under the terms of the contract." To implement this statutory provision, OPM established an administrative procedure for resolution of benefit claims disputes between FEHBA carriers and plan enrollees. See 5 C.F.R. § 890.105. Enrollees who seek judicial review of OPM's decision must bring their suit against OPM and not against the carrier. See 5 C.F.R. § 890.107 (1996), *as corrected by* 61 F.R. 271019. OPM decisions on disputed claims are therefore subject to judicial review under the "arbitrary and capricious" standard of the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(A).

The terms of a contract between a health benefits carrier and OPM, including a plan's Statement of Benefits, which is incorporated into the contract by reference, preempts inconsistent state law. To that effect, Congress has enacted a preemption provision in FEHBA, which reads as follows:

> The provisions of any contract under this chapter which relate to the nature or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans to the extent that such law or regulation is inconsistent with such contractual provisions.

5 U.S.C. § 8902(m)(1).

The legislative history of § 8902(m)(1) makes clear that Congress enacted the provision because it was concerned that application of state law could be expected to not only increase premium costs to both the Government and enrollees, but would lead to a lack of uniformity of benefits resulting in enrollees in some states paying a premium based, in part, on the cost of benefits provided only to enrollees in other states. *See* H.R. REP. No. 282, 95th Cong., 1st Sess. 1 at 4 (1977). Congress sought "to establish uniformity in Federal employee health benefits and coverage." *Id.* at 1. *Burkey v. Government Employees Hospital Association,* 983 F.2d 656, 660 (5th Cir.1993) ("The policy underlying § 8902(m)(1) is to ensure nationwide uniformity of the administration of the FEHBA benefits").

The administrative record in this case relates to a claim for payment of health care incurred by Patricia Cardillo, who is a spouse of a federal employee and is eligible for benefits under FEHBA and the FEHBA Plan as a dependent. As an employee of the Catholic Diocese of Biloxi, Mrs. Cardillo is also a participant in the Diocesan Plan as an

has entered into Contract No. CS 1039 with the Office of Personnel Management (OPM) to provide a health benefits plan authorized by the FEHBA. Contract CS 1039 specifies the manner in which it may be modified or terminated.

This brochure is incorporated into the contract as of January 1, 1992, and describes the benefits, exclusions, limitations and maximums of

the Government-wide Service Benefit Plan for 1992 only. It also describes obtaining benefits. Oral statements cannot modify the benefits described in this brochure.

A subscriber does not have a vested right to receive the benefits in this brochure in 1993 or later years, and does not have a right to benefits available prior to 1992 unless those benefits are contained in this brochure.

eligible employee. She was hospitalized in November of 1992 and received treatment which would have been paid by the FEHBA Plan but for the plan's coordination of benefits ("COB") provisions, which read as follows:

**GENERAL LIMITATIONS**

**All benefits are subject to the definitions, limitations and exclusions in this brochure....**

DOUBLE COVERAGE

Coordination of Benefits

. . .

The Double Coverage provision is intended to prevent payment of benefits which exceed covered expenses. It applies when a person covered by this Plan also has, or is entitled to benefits as a result of, any other group health coverage.... Information about other group coverage must be disclosed to this Plan.

When there is Double Coverage, one plan normally pays its benefits in full as the primary payer, and the other plan pays a reduced benefit as the secondary payer. When this Plan is the secondary payer, it will pay the lesser of (1) its benefits in full, or (2) a reduced amount which, when added to the benefits payable by the other plan, will not exceed either the actual charge for the service, or 100% or the usual, customary and reasonable charge for the service, which ever is less, but never more than would be payable in the absence of double coverage.

The determination of which plan is "primary" (pays its benefits first) is made according to guidelines provided by the National Association of Insurance Commissioners.

The provision applies whether or not a claim is filed under the other plan. When applicable, authorization must be given this Plan to obtain information about benefits or services available from the other plan,

or to recover overpayments from other plans.

(FEHBA Plan Brochure, p. 10).

When the Plan denied payment on March 19, 1993, based on the COB provisions, the plaintiffs, on behalf of Mrs. Cardillo, requested reconsideration. The Plan again denied the requested benefit payments due to the COB restriction on May 11, 1993. Mrs. Cardillo then appealed the Plan's denial to OPM on July 30, 1993. By decision of October 25, 1993, OPM determined that the ultimate decision of the Plan on the claim was correct because of the Plan's health benefits contract.

OPM informed the plaintiffs that it had thoroughly reviewed the claim and made a final decision. OPM stated:

The dispute involves the Plan's level of benefits, whether primary or secondary.... The determination of which plan is primary is made according to guidelines provided by the National Association of Insurance Commissioners (NAIC). According to the NAIC guidelines (copy attached), the Plan covering the person as an employee or annuitant pays primary benefits. The plan covering the person as a dependent pays secondary benefits.

In view of this, the Diocese Plan is Mrs. Cardillo's primary carrier because she is employed by the Catholic Diocese of Biloxi. The Service Benefit Plan has issued the appropriate benefit as the secondary plan.

(Letter of October 25, 1993, from Evelyn H. Sligh, Insurance Benefits Claims Examiner, to Cynthia L. Tolbert).

The plaintiffs have brought this action against OPM seeking judicial review under the APA.[2]

Because OPM's claims decisions and its interpretations and applications of contract provisions are entitled to deference under the APA, they may be reversed only if arbitrary and capricious. Congress has provided that the APA applies to all actions of administrative agencies unless explicitly prohibited by statute. 5 U.S.C. § 701(b)(2); *Harris v. Mutual of Omaha Companies*, 992 F.2d 706,

---

**2.** Plaintiffs also allege jurisdiction under the Employee *et seq.* However, ERISA does not apply

to the FEHBA Plan since it is thereby excluded under 29 U.S.C. § 1003(b).

712 (7th Cir.1993). FEHBA mandates that OPM make final administrative determinations of disputes over benefits in a FEHBA plan. 5 U.S.C. § 8902(j). FEHBA does not exempt OPM's decisions on disputed claims from the APA. Review of OPM's decision under the APA is therefore required. *Caudill v. Blue Cross & Blue Shield of North Carolina, Inc.*, 999 F.2d 74, 80 (4th Cir.1993). (OPM is the final interpreter of FEHBA contracts in order to ensure the uniformity envisioned by Congress).

Under the APA the reviewing court sets aside agency actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action reviewed under this standard is vested with the presumption of validity, and may not be overcome simply because the reviewing court might come to a different conclusion from that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Rather, OPM's action must be affirmed by the court if the court finds that OPM considered the relevant factors and made a rational choice.

The 1992 Statement of Benefits and contract requires a health benefit plan provided to a member as an employee to take precedence over the Plan. The Plan states:

The determination of which plan is "primary" (pays its benefits first) is made according to guidelines provided by the National Association of Insurance Commissioners.

(FEHBA Plan Brochure, p. 10). By this language, the "guidelines" become a contractual provision of the Service Benefit Plan itself. NAIC guidelines provide that when two plans provide medical coverage, the plan which covers an individual as an employee has the responsibility of providing primary coverage.

Regarding the coordination of benefits between two plans, such as the FEHBA Plan and the Diocesan Plan in this case, the NAIC guidelines state:

A plan with order of benefit determination rules which comply with this regulation (Complying Plan) may coordinate its benefits with a plan which is "excess" or "always secondary" or which uses order of benefit determination rules which are inconsistent with those contained in this regulation (Noncomplying Plan) on the following basis:

(a) If the Complying Plan is the Primary Plan, it shall pay or provide its benefits on a primary basis;

(b) If the Complying Plan is the Secondary Plan, it shall, nevertheless, pay or provide its benefits first, but the amount of the benefits payable shall be determined as if the Complying Plan were the Secondary Plan. In such a situation, such payment shall be the limit of the Complying Plan's liability.

(NAIC Guidelines).

The plaintiffs argue that the Diocesan Plan must be treated as an always tertiary or always secondary payor of health benefits, and that OPM's failure to acknowledge this requirement is wrong, arbitrary and capricious.

The COB provisions of the Diocesan Plan read as follows:

## VII. *OTHER COVERAGE PROVISION*

The Catholic Diocese of Biloxi Supplemental Medical Plan is a supplemental benefit program and is intended and funded to provide benefits only when coverage is not available under any other plan or policy. When such coverage is available, **THE PLAN** shall provide excess or secondary coverage.

### A. BENEFITS SUBJECT TO THIS PROVISION

1. When benefits are available under any other plan or policy, benefits under **THE PLAN** will be reduced by benefits available to any employee or dependent covered under such plans or policies. The maximum benefits payable under all plans and policies shall not exceed 100% of the allowable expenses also defined below.

2. When benefits are not available under another plan or policy, benefits under **THIS PLAN** will be fully payable, sub-

ject to all provisions, limitations and exclusions.

3. When benefits are available under another supplemental benefits plan, qualified under Section 105 of ERISA, or any other insurance policy, benefits under **THE PLAN** will be determined to be secondary with such other plan. If such other plan is determined to be secondary then **THE PLAN** will become a Tertiary payor to such other plan(s). *In no event, however, shall the total benefits exceed 100% of the allowed expenses.*

The plaintiffs explain that the Diocesan Plan was developed to provide supplemental coverage for its employees instead of primary coverage largely because it is a self-funded plan. Various entities in the diocese contribute to the plan, and there is no employee contribution except for dependent coverage. If the Diocesan Plan were required to provide primary coverage for all diocesan employees, argue the plaintiffs, it could easily be depleted.

The Court finds, however that this does not make OPM's decision arbitrary or capricious. OPM followed the NAIC guidelines, incorporated into the FEHBA plan, which provide that where a claimant is covered by two plans, one as an employee and one as a dependent beneficiary, the employer's plan will be the primary plan. Had both insurers adopted the NAIC guidelines, no conflict would have arisen. The conflict arose because the FEHBA Plan has adopted the NAIC approach while the Diocesan Plan assumes an "always excess" position. The Diocesan Plan denies primary coverage, while the FEHBA Plan specifically assigns primary liability to the Diocesan Plan.

OPM resolved the conflict by following the NAIC guidelines which give preference to a complying plan (the FEHBA Plan) over a noncomplying plan (the Diocesan Plan). The plaintiffs argue that instead of adopting the findings of OPM, this Court should fashion a federal common law rule to resolve the conflict. However, if the Court were to take this approach, it would also look for guidance to the NAIC's Group Coordination of Benefits Model Regulation.

In 1971, the NAIC developed and issued its first Group Coordination of Benefits Model Regulation. According to Jack B. Helitzer, former chairman of the Industry Advisory Committee to the NAIC Task Force on Coordination of Benefits, COB guidelines were needed because the insurance industry recognized "[t]here is only one way to deal with the problem of duplication of coverage, and that is by having everyone follow the same rules with respect to the order of benefit determination. The alternative is chaos." Jack B. Helitzer, "Coordination of Benefits: How and Why it Works," 4 Benefits Law J. 411, 423 (1991).

The NAIC Group Coordination of Berief its Model Regulation § 5B(1) (1991) provides that "[t]he benefits of the plan which covers the person as an employee, member or subscriber (that is, other than as a dependent) are determined before those of the plan which covers the person as a dependent. . . ." In other words, "[t]he plan covering the person as an employee pays benefits first. The plan covering the same person as a dependent pays benefits second." Helitzer at 415.

Reimbursement or "always excess" plans are not recognized under the Model Regulation. Helitzer explains the reason for NAIC's hostility toward reimbursement plans:

In some isolated instances, uninsured plans write their contracts so that they are excess or always secondary to all other plans. The stated intent is to save money, or "contain costs."

. . .

Whatever "good" reasons employers might have for wanting to be always secondary, they cannot escape the fact that the effort to do so will doom at least some of their employees to a double-secondary situation, in which the individual has double coverage and neither plan has the obligation to pay anything substantial. Responsibility for the resulting problem lies with the employer or plan that adopts a unique order of benefits determination rule, and not with the one who follows accepted practices.

. . .

Some plans maintain an always-secondary position and offer to settle any dispute

with any other plan following the NAIC model by splitting the covered expenses fifty-fifty. Although this may be a practical way to resolve the problem in order to prevent an innocent employee from being caught in the middle of a dispute between sophisticated insurers or plan administrators over an arcane and complex coordination of benefits provision, it has the disadvantage of rewarding a renegade plan for using a nonconforming plan.

Helitzer at 421–22.

To combat the problem of the noncomplying, always-secondary plan, the Model Regulation devised a system by which the noncomplying plan would be deemed the primary plan. Model Regulation § 3G(1). Should the noncomplying plan refuse to accept primary liability, the complying plan would pay its benefits in a secondary capacity first, thereby shifting the larger "primary" payment back to the excess plan. Model Regulation § 7B(2). If the excess plan still refuses to pay, the complying plan would advance full payment to the insured and would obtain a right of subrogation against the noncomplying plan. Model Regulation § 7B(3).

A number of states have adopted the NAIC's approach. *See* Helitzer, "State Adoption of Coordination of Benefits Rules," 4 Benefits Law J. 435, 443 (1991). The Model Regulation has also been well-received in the insurance industry and has been incorporated into most self-insured employee benefit plans. It has also been used by federal courts in fashioning a federal common law rule for conflicting COB provisions in ERISA plans. *See PM Group Life Ins. Co. v. Western Growers Assurance Trust,* 953 F.2d 543, 547 (9th Cir.1992) ("uniformity enables employers 'to predict the legality of proposed actions without the necessity of reference to varying state laws'") (*citing Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987)).

The plaintiffs argue that the NAIC's "employer first" coordination of benefits rule places an unbearable financial burden on the Diocesan Plan, a self-funded ERISA plan, and that it will be unable to provide any benefits as a result. If this is the case, it is unfortunate, but it is not an appropriate concern for this Court. Under ERISA, employers are not required to offer health and welfare benefits to their employees. *Nazay v. Miller,* 949 F.2d 1323, 1329 (3d Cir.1991) ("[i]n enacting ERISA, Congress did not impose a duty on employers to provide healthcare or other benefits to their employees"). Inasmuch as the concept of universal health care coverage is not a policy underlying ERISA, the decision to actively pursue that goal must emanate from Congress, not from this Court.

■ OPM was faced with unambiguous COB provisions in two health benefit plans (one under FEHBA and the other under ERISA) which could not be reconciled. Both plans denied primary coverage and were willing to provide benefits in a secondary capacity only after the other accepted the responsibility of primary coverage. By following the NAIC guidelines giving preference to the complying plan, OPM gave effect to the policies of uniformity and predictability underlying both FEHBA and ERISA. OPM's decision affirming the FEHBA Plan's denial of primary coverage was neither arbitrary nor capricious, and was a reasonable decision under the APA deferential standard. See Caudill, 999 F.2d at 80 (deferring to OPM's interpretation of the Statement of Benefits); *Kobleur v. Group Hospitalization & Med. Services,* 954 F.2d 705, 711 (11th Cir.1992) (also deferring to OPM's interpretation of the Statement of Benefits); *Myers v. United States,* 767 F.2d 1072, 1074 (4th Cir.1985) (deferring to OPM's interpretation of a FEHBA plan).

■ Also before the Court is defendant Blue Cross's motion to dismiss. Pursuant to 5 C.F.R. § 890.107 (1995), a legal action for judicial review of a final action by OPM is to be brought against OPM. The March 1995 amendments to the regulation clarify that the action is to be brought against OPM rather than the FEHBA carrier that made the initial decision. Summary, March 29, 1995, 5 C.F.R. Part 890. Having determined that this action is one for judicial review of a final action by OPM, the Court also finds that

Blue Cross is not a proper party. Accordingly, for the reasons stated above,

IT IS HEREBY ORDERED that the defendant Blue Cross, Blue Shield of Texas's motion to dismiss **(docket entry no. 18)** is GRANTED;

FURTHER ORDERED that the plaintiffs Catholic Diocese of Biloxi Supplemental Medical Reimbursement Plan and Catholic Diocese of Biloxi, Office of Risk Management's motion for summary judgment **(docket entry no. 20)** is DENIED;

FURTHER ORDERED that the defendant Office of Personnel Management's motion for summary **(docket entry no. 24)** is GRANTED to the extent that it seeks a declaration of the plaintiffs' primary liability. In addition, this Court declares the Diocesan Plan to be primarily liable and the FEHBA Plan to be secondarily liable for the claims of Patricia Cardillo. A final judgment dismissing the Plaintiffs' complaint will follow.